IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION


EDWARD MOORE,

        Plaintiff,

V.                                   CASE NO. 2:10CV00066-NBB-SAA

USG CORPORATION,
d/b/a USG INTERIORS, INC.

        Defendant.


## MEMORANDUM OPINION

This cause arises from Plaintiff's hostile work environment claim under Title VII. Defendant now moves for summary judgment, arguing that Plaintiff's claims are without merit and unsupported by the evidence. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted.

<u>Summary Judgment Standard</u>

"Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir. 2005). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must "go beyond the pleadings" and "by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp,* 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c), 56(e)). "The mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

"[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* "The appropriate inquiry is 'whether the evidence presents a sufficient disagreement as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus,* 399 F.3d at 609.

## Factual and Procedural Background

The plaintiff, Edward Moore, is employed by Defendant USG Interiors, Inc. ("USG") and has been an employee since 1999. Moore is an equipment operator in USG's Greenville, Mississippi, manufacturing plant. Moore alleges that he has been subjected to sexual harassment by primarily other men, both supervisors and coworkers, throughout his employment, and that this alleged sexual harassment has created a hostile work environment. He alleges that he has been harassed at work because he did not meet certain male gender stereotypes and relies on *Price Waterhouse v. Hopkins,* 490 U.S. 228, 235 (1989), a case in which the U.S. Supreme Court allowed evidence of gender-stereotyping to support a female plaintiff's claim that she was not

made a partner because of gender discrimination.  Moore acknowledges that the Fifth Circuit has

not recognized a cause of action for failure to meet gender stereotypes under Title VII pursuant

to *Price Waterhouse* but states that other federal courts have.  However, the plaintiff cites only

two cases for this proposition and one of the cases cited by the plaintiff is not a Title VII case.[1]

There are numerous contradictory federal cases on this issue.   While Moore's response to

summary judgment claims that Moore was "perceived as having effeminate qualities," Moore

testified at his deposition that while he believes that he comes across as homosexual, he does not

perceive himself to be effeminate:

> Q: Do you believe that, you know, you come across as being homosexual?
> A: Sometimes, yeah.
> Q: To your perception, do you perceive yourself to be effeminate?
> A: Not really.

He testified that when he began growing his hair out into dreadlocks around 2007, eight years

into his employment, he "looked a little bit like a woman," and that "one or two" employees told

him that his hair made him look effeminate.  But when asked whether any "employees of USG

interiors ever told you that you acted in an effeminate manner?," Moore stated, "I don't recall."

Moore testified further that "the boys targeted [him]" because he did not discuss his sexual

conquests of women like other men did.

Moore is, in fact, homosexual.  He admits living with a homosexual partner during the

majority of his employment at USG, and he testified in his deposition that he believes "all" of his

---

[1] *Nichols v. Azteca Enter., Inc.,* 256 F.3d 864 (9th Cir. 2001)(holding plaintiff can prove sex
discrimination under Title VII by presenting evidence that he was harassed based on perception that he
had "feminine mannerisms" and "did not act as a man should."); *Glenn v. Brumby,* 632 F.Supp.2d 1308
(N.D. Ga. 2009)(holding that public employee transitioning from male to female who was fired after
dressing in women's attire could proceed under Equal Protection Clause of Fourteenth Amendment).

coworkers "felt that [he] was homosexual," though he contends that he did not reveal his sexuality to anyone at work.

The employer USG filed for summary judgment on several bases. It alleges that Moore has not alleged harassment based on gender, but instead has alleged discrimination based on sexual orientation, which is not a protected class under Title VII. USG argues that because the Fifth Circuit has not recognized a cause of action for gender-stereotyping under Title VII, Moore cannot proceed on that theory. USG contends that many of the episodes that Moore alleges are sexual harassment were results of coworker disputes provoked by Moore where Moore's coworkers reacted out of anger and animosity. USG maintains that it cannot be liable for the alleged harassment alleged by Moore because it was not sufficiently severe and pervasive. USG also maintains that it cannot be liable because Moore reported very few of the numerous incidents for which he now seeks relief, and that each time Moore did report an incident, he experienced no further harassment from the employee that he reported. USG contends that the plaintiff's admissions that the conduct of the alleged harasser ceased each time he reported the harasser shows that USG exercised reasonable care to prevent and correct any allegedly sexually harassing behavior. Finally, USG argues that Moore's state-law claims cannot be maintained because they are duplicative of his Title VII claim and preempted by Mississippi's Worker's Compensation Act.

In his response to USG's motion for summary judgment, Moore admits that several incidents of which he now complains "appear[] to be out of anger or simply as joking 'comebacks.'" He concedes that he did not report the majority of the incidents but claims that he can still maintain his Title VII claim because the alleged sexual harassment was "pervasive,"

"life threatening" or physically threatening at times, and perpetrated or witnessed by his supervisors "and/or coworkers that he considered to be supervisors." He also alleges that "he had lost all faith in USG's ability to investigate employment issues brought to their attention." Moore contends that he has set forth sufficient facts for a negligent infliction of emotional distress claim to proceed should his Title VII claim stand but concedes now that he cannot maintain the remainder of the state law claims raised in his complaint.

USG has implemented an anti-harassment policy and a complaint procedure policy. Moore admits that he has known about the complaint procedure since he began his employment and that the policy was posted in the plant. Moore signed a statement acknowledging his receipt of the anti-harassment policy when he was hired and signed another acknowledgment that he was aware of this policy in 2001. Moore also admits that he was given a card "probably" shortly after he was hired with a hotline number and told "to call this number, you know, if we had issues, problems, complaints that we didn't want to go the supervisors, you know." On one occasion during the beginning of his employment, Moore admits he was "commended" for calling the hotline about a safety complaint and given a twenty-five dollar gift certificate.

USG's anti-harassment policy directs employees to inform their supervisor or local human resources manager if they experience intimidating, offensive or degrading remarks, including unwelcome sexual advances, requests for sexual favors, physical threats, or other inappropriate conduct concerning a person's race, color, religion, gender, sexual orientation, age, national origin or mental or physical disability. The anti-harassment policy states that the employee will not be discriminated or retaliated against on the basis of reporting such behavior and provides the number of non-local human resource personnel as an alternate route for

reporting the harassment if an employee does not feel comfortable reporting the harassment to persons at the local plant. USG's complaint procedure advises employees with complaints or problems to discuss their problems with their supervisor, and if the problems are not settled, to discuss them with their foreman, and if the employee is still not satisfied, to discuss the matters with their Department Manager. If the issues are not remedied with the Department Manager, the policy provides that complaints be reviewed by the Plant Manager or Corporate Office.

Moore has submitted only his own deposition and EEOC affidavit as evidence against USG's motion for summary judgment. The numerous incidents of sexual harassment that Moore alleges are as follows:

1. Around the beginning of Moore's employment with USG in 1999, a supervisor, DeWayne Brown allegedly told Moore that "all he wanted [Moore] to do was suck his dick." Moore testified that he reported this incident to USG and that Brown did not thereafter harass him again.

2. Around the beginning of Moore's employment, Moore contends he was cursed out by Columbus Echols, a supervisor, for "something to do with the boards not running properly down the line," and Echols called Moore a "son of a bitch," and a "motherf—ker." Moore reported this incident and testified that Echols "never cursed [him] out in that manner again," although Moore claims that Echols did refer to him as a "bitch" and "punk" afterwards, though Moore never reported Echols for doing so. Moore testified that he was unjustifiably written up a year and a half later for threatening another employee in retaliation for reporting Echols.

3. In February 2001, Moore alleges that he was working on a spray paint operator with coworkers Felix "Lucky" Tyler and Kelvin Arrington when Tyler asked him if he was gay. Moore stated that he was not a homosexual, and Tyler responded that that was good because he would have "beat the sh-t out of him" and "shoved a stick up him." Moore did not report this incident.

4. Moore alleges that in 2002 or 2003, a coworker John Dillard nearly choked him to the point of unconsciousness after Moore criticized Dillard's parenting skills and told Dillard about "the ill fate of children with no discipline." Moore did not report this incident.

5. In August 2004, Moore alleges that a coworker Robert Hannah complained to Moore about not being able to work the spray painter and called Moore a "gay ass," to which Moore retaliated by engaging in the same type of comment of which he complains, telling Hannah that "may be [sic] he was gay." Moore reported this event to USG. While Moore contends that Hannah continued to call him a "punk," "gay ass," and "gay motherf---er" afterwards, Moore testified that he only "heard" this. Because Moore has no personal knowledge of Hannah's comments continuing and has not submitted evidence from anyone with personal knowledge that the comments continued, there is no evidence in the record that Moore continued to be harassed by Hannah after Moore reported Hannah to USG.

6. Sometime around 2005, Moore testified about an incident where he and coworker Fred Holmes were arguing over whose job it was to move pallets, and Holmes called Moore a "gay ass mother--ker," to which Moore responded by calling Holmes a "damn nigger." Moore alleges that a supervisor witnessed this event and that when he later discussed the

matter with that supervisor, the supervisor told him that if he wrote up Moore and Holmes in a disciplinary report, both Moore and Holmes would probably be fired. Moore testified that before this incident, Holmes would call Moore "punk and gay or something," and Moore would, in turn, call Holmes "fat" because Holmes, he said, is "huge." But after the pallet incident and Moore's reporting the matter to the supervisor, Holmes did not engage in any sexual comments or actions against Moore, or "if he did, it was behind my back."

7. Moore alleges that around 2005, a supervisor Robert Homan made a comment about "f---ing" Moore after Moore fell down at work and had his buttocks in the air. Moore testified that he learned of this event "years later" when he was told about it by coworker Greg McKinnie. Moore did not report this incident until September 2008 when he complained about another incident, listed as number sixteen below. Moore has no personal knowledge of this incident occurring, has not submitted evidence from anyone with personal knowledge of this incident occurring, and the court will not consider this incident.

8. On June 2006, coworker Greg McKinnie allegedly told Moore that he had "a nice pair of lips" and that Moore should "let him suck [his] dick." Another coworker Frank Harris then allegedly said, "Well, he does have a nice pair of lips." Moore did not report this incident.

9. Moore testified that coworker Greg McKinnie called him a "faggot" and a "punk." Moore lived with a man named Walter during a period of time, and Moore testified that McKinnie's house was worked on by Walter's brother. McKinnie told Moore, "your

brother-in-law did my – redid my house."  Moore did not report any of these comments by McKinnie to USG.

10. In the summer of 2006, Kenny Williams, a coworker of Moore's, allegedly told Moore in front of two other coworkers, that he wanted to "tie [Moore] up, beat the sh-t out of [him], f--k [him] down, and take all [his] manhood."  Moore did not report this incident.

11. Sometime around 2008, Moore testified that he attended a party at his sister's house with his roommate Walter and that a coworker Dorothy Barnes was there.  Moore alleges that Barnes went back to work and told "all of the people on the shift" how he and Walter "were acting like lovers."  Moore did not hear this information firsthand, but was "told." Moore did not report the incident.  Again, Moore has no personal knowledge of this incident occurring, has not submitted evidence from anyone with personal knowledge of this incident occurring, and the court will not consider this incident.

12. In March 2008, Larry Roberts, a coworker allegedly threatened Moore with a box cutter and dared him to "do something about it," while calling Moore a "punk ass."  Moore testified that "punk" means homosexual.  Moore did not report this incident.

13. In approximately May or June 2008, Moore testified that a newspaper clipping regarding homosexual marriages was taped to his locker while he was away on vacation.  Moore testified that he does not know who put the clipping on his locker and that he intentionally left the clipping on his locker for a week after he found it and testified that he "figured it was just one of the little petty pranks that the fellows were doing, calling it a joke."  When asked why he thought the clipping was taped to his locker, Moore responded, "because they felt that I was homosexual."  He stated that "they" referred to

his coworkers and that he believed "all of them" felt he was homosexual.  He did not report the incident.

14. In September 2008, Moore alleges that he was offered an ice cream sandwich by a coworker Alvin Hudson who told Moore that supervisor Larry Dunn had said that Moore used to be his sweetheart and that the snack was from Dunn, who "had gotten sweets for his sweet."  Moore did not report this incident.

15. Alleging no specific date, Moore testified that his relief supervisor Reginald Whitley recommended a movie with a homosexual plot to Moore.  Moore testified that he told Whitley that the homosexual male character looked like him [Whitley].  Whitley told Moore, "You're the one that's gay."  Moore then told Whitley that girls had said that Whitley had a small penis and that "he laid up in the bed and didn't do anything, you know, except for sleep."  Whitley retaliated by saying, "I know that you done had that big ole thing of Kenny's in you."  Moore did not report this incident.

16. On September 10, 2008, Moore testified that he accidentally released air pressure from a paint block onto his supervisor Larry Dunn's legs, which did not injure Dunn, but Dunn became angry and pushed Moore and allegedly stated: "Motherf--ker if you ever get paint on me . . . I want you to hear this, nigga, if you ever get paint on me again, I will meet you outside and f--k you up."  The event resulted in an investigation by management, during which Moore contends that his relief supervisor Reginald Whitley and coworker Larry Roberts "lied," and as a result, Moore states that Dunn was not punished but instead he [Moore] received a disciplinary write-up for not reporting an earlier incident involving Dunn.  He testified about the event: "You know, this is why we don't report

stuff, because when we report it, you know, we have to suffer from our supervisors . . . ."  Moore's disciplinary write-up was removed from the file shortly afterwards.  Moore admitted during his deposition that after the incident and his reporting of Dunn, Dunn did not thereafter threaten him, discipline him, cut his work hours, give him bad assignments, or take any negative job action against him.

17. On September 20, 2008, coworker Kenny Williams allegedly referred to Moore as his "boo" and told coworker Harrison Tucker in Moore's presence how good his "boo" was looking.  Moore testified that "boo" means "baby" and "sweetie."  Moore alleges that Williams then tried to wrap his arms around Moore's waist.  Tucker responded to Williams that he did not understand what Williams saw in Moore and stated "he ain't got no ass no how."  Later that day, Williams allegedly approached Moore and told him that "[he] could just imagine [Moore's] lips wrapped around the head of [his] dick and how good it would feel."  Moore did not report these incidents.

18. Moore alleges that on October 12, 2008, a coworker Felix Tyler told him that another coworker Harrison Tucker had knocked on the women's restroom door looking for Moore and stated that he knew Moore "was not gone because he had left his purse on the table."  Moore did not witness this event but only heard about it.  He also did not report it.  He testified that he did not report the incident because of the "stress, anxiety, fear, all of those things" he felt after the internal investigation regarding the Dunn incident (number 16 *supra*).  Again, Moore has no personal knowledge of the "purse" incident occurring, has not submitted evidence from anyone with personal knowledge of this incident occurring, and the court will not consider this incident.

19. On October 23, 2008, Moore alleges that coworkers Greg McKinnie and Kenny Williams mimicked the act of fellatio towards Moore, and McKinnie said "that [was what Moore] would be doing on Kenny's dick." Moore did not report this incident.

20. On October 24, 2008, coworker Greg McKinnie allegedly showed Moore a pornographic video containing a male and a female on his cell phone. McKinnie then showed Moore a picture of a penis on the cell phone and stated, "now that's a pretty picture." Later that day, Moore alleges that coworker Kenny Williams told Moore that McKinnie had said that Moore thought the picture of the penis was "nice." Williams then allegedly stated that his penis was bigger than McKinnie's penis. Moore reported neither McKinnie nor Williams for these incidents.

21. On October 27, 2008, coworker Greg McKinnie and Moore were working on a tile machine together when McKinnie allegedly said to Moore, "Look at you acting like a little girl. Stop whining, gal." Moore reported this incident and admitted that afterwards, McKinnie made no further offensive comments towards him. The disciplinary write-up from this event stated Moore "tried to instigate an argument again by refusing to pass a can of rust breaker across the line to Mr. McKinnie." When asked if this occurred, Moore testified, "It did. That rust breaker, if I'm not mistaken, belonged to the mechanics. It wasn't mine to pass to McKinnie."

22. While alleging no specific dates, Moore contends that his relief supervisor Reginald Whitley often refers to him as "fruity booty" and states that he is "not a man" and makes statements like, "look how you move." Moore also complains Whitley told him that he [Whitley] liked "to eat ass and lick feet." Moore admitted in his deposition that he

understood Whitley to be referring to females.  Moore never reported Whitley for these alleged comments.

23. Moore alleges that after filing his EEOC charge in January 2009, coworker Felix Tyler walked by him, and "I thought he put his hand, you know, on my rear-end."  He states that Tyler, in a separate incident "brushed his midsection across my backside."  Moore reported neither incident, stating that he did not report Tyler because "I really didn't want to get Felix in trouble" and stating "I didn't want to go through the same crap that I went through with the company before," referencing the Dunn air-pressure incident investigation (number 16 *supra*).

24. Also after the filing of his EEOC complaint and during a period where USG was investigating the complaint, coworker Kenny Williams allegedly told Moore that "he didn't think I was gay, and if he had thought I was, he'd had me out there in that little red house, you know the outside, those little porta-potties, sucking my – sucking his dick."  Moore also alleges that after he filed his EEOC complaint, his relief supervisor Reginald Whitley told him that he had lost weight and that his "butt was so small that a woman can't hold onto it."  Moore did not report either incident.

Moore took approximately two weeks of medical leave beginning October 28, 2008, because of "McKinnie, Dunn, coming into an unfriendly work area at that time."  He said that his problems resulting in his taking medical leave started because of the Dunn incident on September 10, 2008 where Moore's supervisor, Dunn, cursed and pushed Moore after Moore accidentally released air pressure from a paint block onto Dunn's legs.  Moore referred to this incident with Dunn in his deposition as "the incident that we're, like, here about."  He testified

that he lost weight, saw a psychiatrist on several occasions, and took an antidepressant for a short time.  He testified that he sees a therapist once a month and takes sleeping pills.  He claims that the events at work have disrupted his ability to concentrate at work and perhaps even put his life in danger because of the types of equipment that he works with, but he maintains that his work performance remains "[v]ery good."  He alleges loss of reputation, humiliation, pain and suffering, inconvenience, and emotional distress.

Moore admits that he has heard other male employees refer to each other as "bitches," but not the degree that he has been called that name.  He testified that Kenny Williams told another employee who allegedly slept with Williams' ex-wife that "the same way you f—ked my wife, I'm going to f—k you."  Moore testified that his coworkers "can poke fun at you, but if you get a joke on them, oh, you've got something serious on your hands.  You've got problems."  But Moore admits in his deposition that he provoked and invited hostile behavior from his co-employees:

> Q:    [W]as it ever your perception that these individuals, like, you know, Robert Hannah, Greg McKinnie, Frank Harris, Reginald Whitley, the one's we've discussed before, were mad at you for some reason, or angry at you because of any workplace incidents?  Is there some hostility for some reason, that you're aware of?  . . . . Was it your perception that they were angry with you?
>
> . . .
>
> A:    There were times when they were angry; not all the time.
>
> Q:    Okay.  And what is your understanding of why they would be angry at you?
>
> A:    Uh, for one reason, the fellows don't like to be laughed at.  They don't like to be out-witted.  So you get a good one in, and it's like their first defense with me, was to attack my sexuality.
>
> Q:    Because you had gotten the best of them in some fashion?

A:      Because I had probably had the audience, be it on the floor, in the break room, rolling, laughing at a response, you know.

. . .

Q:      Okay.  You said it was like a defense mechanism?

A:      Yeah, it was like, okay, we could be talking about something.  Most of the time it was nonsexual.  If you got an audience to laugh at them, and most of the fellows did not like to be laughed at with me, the first thing they did was attack my sexuality.

As an example of this provocation, Moore testified that Kenny Williams told Moore in front of an audience in the break room that Moore needed a haircut, to which Moore replied, "Kenny, you act like you are going to be running your fingers through my hair."  This caused the break room to erupt in laughter, and Williams responded, "You motherfucker, I ain't no damn punk.  I will beat your f--king ass."   Moore's comment suggesting that Williams might be running his fingers through Moore's hair is the same type of comment for which Moore now seeks relief, and Moore's deposition testimony provides ample examples of Moore engaging in the same type of vulgar banter and locker-room talk that he asks the court to find actionable.  For instance, as has been discussed, Moore told Whitley that he had heard girls say that Whitley had a small penis, when Whitley stated that Moore was the one who was gay.  Moore called Holmes a "damn nigger" after Holmes called him a "gay ass mother—ker."  Moore also admitted in his deposition that he engaged in discussions about Kenny Williams beating his wife, stating that it was "freely discussed."  He testified that he told Greg McKinnie that his wife was a "bitch," although he rationalizes using this epithet because he says McKinnie started it by calling Moore a "bitch."  Moore testified that he "often argued" with McKinnie and referred to him at times as "Half-head" because McKinnie has a deformity on his head because of a surgery.  Moore also rationalizes using this derogatory term by saying that McKinnie started it.   On two separate

instances, one in 2009 and one in 2001 (mentioned *supra,* number 2), Moore was suspended for allegedly threatening another coworker, but he testified that both suspensions were unjustified.

Though Moore complains of numerous incidents of alleged harassment by Kenny Williams, Moore testified in his deposition that he went to the casino twice on social occasions with Williams outside of work in 2009, after the alleged sexual harassment occurred. He testified that he confided in Williams and sought his advice after the air-sprayer incident with Dunn, and Williams told him to start a "paper trail" about incidents at work, yet ultimately Williams became an object of this paper trail. He also stopped by the house of another alleged harasser, Greg McKinnie "two or three years ago" or in approximately 2007 or 2008 to borrow a screwdriver. Moore was asked in his deposition whether this visit was "after the exchanges you guys had had," and he responded, "[s]ome of them, yes." This visit certainly occurred after the alleged 2006 incident where Greg McKinnie allegedly told Moore that he had "a nice pair of lips" and that Moore should "let him suck [his] dick."

Moore complains that he was targeted by supervisors and human resources: "Every move I made was noted, and anything that was, you know, a little shady, I was called on it." But he also admits that he engaged in insubordination and had a knack for getting an audience to laugh at his supervisors: "There were several encounters with me and Brown [a supervisor], me and Echols [a supervisor]. If you got an audience to laugh at the supervisors, you had problems." He admits to a one-day suspension in 2001 where he cursed his supervisor ([W]e were shouting at each other, curse words came from both of us."). He also admits telling a supervisor that the supervisor promoted a woman because he was "sleeping" with her.

**DISCUSSION**

**I.      Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Sexual harassment in the form of a hostile work environment constitutes sex discrimination.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  As is evident from the above-quoted Title VII language, sexual orientation is not a prohibited basis for discriminatory acts under Title VII.

To establish a Title VII hostile environment where the alleged harasser is a <u>coworker</u>, a plaintiff must prove five elements: (1) the plaintiff belongs to a protected class (*i.e.,* a simple stipulation that the employee is a man or a woman); (2) the plaintiff was subject to unwelcome sexual harassment; (3) the harassment was based on sex (*i.e.,* the harassment is based on the plaintiff's gender); (4) the harassment affected a term, condition, or privilege of employment (*i.e.,* the sexual harassment must be sufficiently severe and pervasive so as to alter the conditions of employment and create an abusive work environment), and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  *Watts v. Kroger Co.,* 170 F.3d 505, 509 n. 3 (5th Cir. 1999) (distinguishing supervisor sexual harassment claims from co-worker sexual harassment claims); *Sharp v. City of Houston,* 164 F.3d 923, 928-29 (5th Cir. 1999)(same); *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 298 n. 2 (5th Cir. 2001)(same); *see also Jones v. Flagship Intern.,* 793 F.2d 714, 719 -720 (5th Cir.1986)(defining elements**).**

In *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Indus., Inc v. Ellerth*, 524 U.S. 742 (1998), the U.S. Supreme Court modified the elements for establishing a hostile work environment claim where the alleged harasser is a <u>supervisor</u>. In such cases, the employee plaintiff need only meet the first four elements listed above. *Faragher,* 524 U.S. at 807-808; *Burlington*, 524 U.S. at 765. Once an employee makes this showing, an employer may be held vicariously liable for the sexual harassment of its supervisor. *Watts,* 170 F.3d at 509. However, where there is no tangible employment action taken against the employee – and none has been alleged in this case under consideration -- the employer has an affirmative defense or "safe harbor" and will not be liable under Title VII if it proves: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher,* 524 U.S. at 807-808; *Burlington*, 524 U.S. at 765. As an alternative to vicarious liability in an alleged supervisor harassment case, an employer may be held responsible for a hostile work environment "if it knew or should have known of the harassment and failed to take prompt remedial action." *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 404 (5th Cir. 1993). "The concept of negligence thus imposes a 'minimum standard' for employer liability – direct liability – under Title VII, a standard that is supplemented by the agency-based standards for vicarious liability as articulated in *Faragher* and *Burlington*." *Sharp,* 164 F.3d at 928 (internal citation omitted).

A.    <u>Severe and Pervasive Harassment Based Upon Sex</u>

In *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998), the U.S. Supreme Court held that same-sex sexual harassment is actionable under Title VII, but only if the plaintiff

can "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex." *Id.* Workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* The "mere utterance of an . . . epithet which engenders offensive feelings in an employee" does not affect the conditions of employment to a sufficiently significant degree to violate Title VII. *Meritor,* 477 U.S. at 67. "Sex-neutral hostile conduct cannot be used to support a hostile environment claim. Title VII does not protect employees from hostile conduct that is not based on their protected status." *Farpella-Crosby v. Horizon Health Care,* 97 F.3d 803, 806 n.2 (5th Cir. 1996). The record must demonstrate that the abuse was motivated by the plaintiff's gender rather than by a personal dislike, grudge, or workplace dispute. *Barnett v. Tree House Café, Inc.,* No. 5:05-cv-95, 2006 WL 354025, *12 (S.D. Miss. Dec. 8, 2006) (citing *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000)). "It is a simple fact that in a workplace, some workers will not get along with one another," and the Fifth Circuit has stated that it "will not elevate a few harsh words or 'cold-shouldering' to the level of an actionable offense." *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 564 (5th Cir. 1998).

Furthermore, even if harassment is shown to be based on gender, the plaintiff must put forth evidence that the alleged sexual harassment was "severe or pervasive." *Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 325 (5th Cir. 2004); *Shepherd v. Comptroller of Public Accounts of State of Texas,* 168 F.3d 871, 874 (5th Cir. 1999). Sexual harassment is sufficiently severe and pervasive if it "alter[s] the conditions of [the victim's] employment and creates an

abusive working environment.'" *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 433 (5th Cir. 2005). Title VII is not a "general civility code," and "the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale,* 523 U.S. at 81. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.* "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993). The environment, thus, must be deemed "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and on that the victim in fact did perceive to be so." *Lauderdale v. Texas Dept. of Criminal Justice, Inst. Div.,* 512 F.3d 157, 163 (5th Cir. 2007)(internal citations omitted). [W]hile an employee need not prove tangible job detriment to establish a sexual harassment claim, the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment." *Jones,* 793 F.2d at 720.

Deciding an alleged hostile work environment case "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "[S]imple teasing, offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Hockman*, 407 F.3d at 328 (citing *Faragher*, 524 U.S. at 788).

The "severe and pervasive" element of a hostile work environment claim is "crucial, and sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory 'conditions of employment.'" *Oncale,* 523 U.S. at 81. "In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field – even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.* at 81-82.

In *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), the U.S. Supreme Court's principal holding involved, not gender stereotyping, but the burden of proof in a mixed-motive case alleging discrimination. In addition to this holding, the Court held that the plaintiff was allowed to use evidence of sex stereotyping to prove her claim that she had been denied partnership in a large accounting firm based on her gender. The Court found that the district

court was proper to allow in evidence in the form of comments submitted by partners during the partnership process that the plaintiff was "macho," "a lady using foul language," "a tough-talking somewhat masculine hard-nosed manager," "overcompensated for being a woman," and could improve her partnership chances by learning to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." The Court found that evidence that other female candidates for partnership had been evaluated in sex-based terms was also proper to consider. The Court stated: "As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse,* 490 U.S. at 251. The Court clarified its point that gender-stereotyping is merely evidence of discrimination, not a cause of action in itself by stating: "Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on . . . gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part." *Id.* at 251 (emphasis in original). The plaintiff in *Price Waterhouse* used evidence of gender-stereotyping to show the employer's general hostility to women as partners in the firm and to show a partnership selection process that treated female senior managers less favorably than men.

At the time *Price Waterhouse* was decided in 1989, there was a circuit split over whether same-sex sexual harassment was actionable at all, and the U.S. Supreme Court resolved this split

ten years after *Price Waterhouse* in *Oncale*, where it reversed the Fifth Circuit's holding that same-sex harassment was not actionable and held that Title VII does provide a cause of action for same-sex harassment. *Oncale,* 523 U.S. at 79-80. The male plaintiff in *Oncale*, a married father of two, worked on an offshore rig and alleged that a male supervisor and male coworker restrained him while another male supervisor placed his penis on the plaintiff's neck on one occasion and on his arm on another occasion. The two supervisors also allegedly threatened the plaintiff with homosexual rape, and one of them allegedly forced a bar of soap into the plaintiff's anus while the other restrained him as he was showering on the employer's premises. *Oncale v. Sundowner Offshore Services, Inc.,* 83 F.3d 118, 119 (5th Cir. 1996), *overruled by Oncale,* 523 U.S. at 79-80. The U.S. Supreme Court vacated the award of summary judgment and remanded with the basic instruction that "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms of conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80. The Court suggested three ways a male plaintiff could establish a hostile work environment claim based on same-sex harassment: First, he can show that the alleged harasser made "explicit or implicit proposals of sexual activity" and provide "credible evidence that the harasser was homosexual." *Id.* Second, he can demonstrate that the harasser was "motivated by general hostility to the presence of [members of the same sex] in the workplace." *Id.* Third, he may "offer direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* The *Oncale* case settled before being heard again by the Fifth Circuit.[2]

---

[2] McGough, Philip, *Same-Sex Harassment: Do Either Price Waterhouse or Oncale Support the Ninth Circuit's Holding in Nichols v. Azteca Restaurant Enterprises, Inc. That Same-Sex Harassment Based on Failure to Conform to Gender Stereotypes is Actionable?,* 22 Hofstra Lab. & Emp. L.J. 206, 223 (2004).

Whether same-sex harassment based on gender stereotypes is actionable is an issue that the Court in *Oncale* did not consider.[3] In fact the Court had the opportunity to address the issue because five days after *Oncale* was decided, the Court vacated and remanded another same-sex harassment case, *Belleville v. Doe,* 523 U.S. 1001 (1998), to the Seventh Circuit, ordering reconsideration in light of *Oncale.*[4] The Seventh Circuit's *Belleville* decision explicitly relied on *Price Waterhouse* and found that the male plaintiff could proceed to trial on the theory that he failed to conform to traditional notions of masculinity. *Doe by Doe v. City of Belleville, Ill.,* 119 F.3d 563 (7th Cir. 1997)(*vacated by Belleville*, 523 U.S. at 1001). The plaintiff in *Belleville* wore an earring, was repeatedly called a "queer," "fag," and "bitch," was asked by a coworker if he was a boy or girl, was told by a coworker that he was going to take him "out to the woods" and "get [him] up the ass," and had his testicles grabbed by a coworker. *Id.* at 566-67. Yet the U.S. Supreme Court published no opinion when it vacated and remanded *Belleville*, but instead simply stated that the decision be reconsidered in light of *Oncale.* Thus, the U.S. Supreme Court has not endorsed gender stereotyping as a cause of action for plaintiffs who do not conform to gender norms.

The Fifth Circuit has also never done so. The only published decision by the Fifth Circuit regarding same-sex harassment since *Oncale* is *La Day v. Catalyst Technology, Inc.,* 302 F.3d 474 (5th Cir. 2002), where the Fifth Circuit reversed the district court's grant of summary judgment for the employer and found that the male plaintiff had presented a fact question under the first suggested route for proving same-sex harassment under *Oncale* --whether his harasser is homosexual and harassed him severely enough to alter the conditions of employment. The Fifth

---

[3] *Id.* at 207.
[4] *Id.* at 222.

Circuit found that there are two types of evidence that are likely to be especially credible proof that the harasser may be homosexual. "The first is evidence suggesting that the harasser intended to have some kind of sexual contact with the plaintiff rather than merely to humiliate him for reasons unrelated to sexual interest." *Id.* at 480. "The second is proof that the alleged harasser made same-sex sexual advances to others, especially to other employees." *Id.* The Fifth Circuit found that for purposes of surviving summary judgment, the plaintiff had produced both types. He had put forth evidence that his supervisor had walked up to the plaintiff and his girlfriend, and seeing "passion marks" on the plaintiff's neck, stated: "I see you got a girl. You know I'm jealous." *Id.* at 476. On a later date, the supervisor had fondled the plaintiff's anus while the plaintiff was bending down, and the plaintiff immediately turned around and told the supervisor, "I don't play like that" and reported the matter to the employer. *Id.* The supervisor later that day spit tobacco on the plaintiff's hat, which the court found could plausibly have been evidence of the supervisor's anger towards the plaintiff for rejecting his sexual advance. *Id.* at 480. Another coworker had also filed a written complaint against the alleged harasser, alleging that he had asked him to sit on his lap and told him that he had "pretty lips" and that he could "suck dick" or "suck my dick." *Id.* at 477.

In *La Day,* the Fifth Circuit cited with apparent agreement the decision of the Ninth Circuit in *Rene v. MGM Grand Hotel, Inc.,* 243 F.3d 1206 (9th Cir. 2001), where the Ninth Circuit upheld summary judgment for the employer where the alleged sexual harassment of a male in an all-male work environment consisted, among other things, of being grabbed in the crotch and poked in the anus on numerous occasions, being forced to look at pictures of naked men having sex while coworkers looked on and laughed, being caressed, hugged, whistled and

blown kisses at, and being called "sweetheart" and "doll." When the plaintiff in *Rene* was asked why he believed his coworkers engaged in the conduct, the plaintiff responded that it was because he was gay. *Id.* at 1207. The Ninth Circuit found that the plaintiff in *Rene* had not offered any evidence under the three suggested routes of proof of same-sex harassment in *Oncale* and had failed to raise a triable issue of fact with regard to whether the harassment he faced was motivated by gender. *Id.* at 1210. Instead, the court found that the plaintiff was discriminated against on the basis of his sexual orientation. *Id.*

Confusing the issue somewhat, however, is the fact that after rehearing *en banc*, the Ninth Circuit reversed and remanded, finding that the physical acts of being grabbed in the crotch and poked in the anus "targeted body parts clearly linked to [the plaintiff's] sexuality" and "were 'because of sex.'" *Rene v. MGM Grand Hotel, Inc.,* 305 F.3d 1061, 1066 (9th Cir. 2002).

The court is aware that other federal circuits and district courts outside of this circuit have allowed hostile work environment cases to proceed on a theory that the plaintiff was harassed for failure to conform to gender norms in his or her appearance or behavior. The Fifth Circuit has not done so, nor does it appear that the plaintiff could prevail on such a claim anyway, considering the plaintiff does not believe he is effeminate. The precedent that this court must follow is *Oncale* and *La Day*, which clearly state that same-sex harassment is actionable and that three ways of proving same-sex harassment are: (1) evidence of "explicit or implicit proposals of sexual activity" and "credible evidence that the harasser was homosexual"; (2) evidence that the harasser was "motivated by general hostility to the presence of [members of the same sex] in the workplace, " and (3) "direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* The plaintiff may use evidence of gender

stereotyping to prove gender discrimination, just as the plaintiff used that evidence in *Price Waterhouse* to prove general hostility towards women and disparate treatment of women. However, the plaintiff in this case has not created a genuine issue of material fact that he was harassed because of his gender. As stated in *Oncale* and *La Day*: "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms of conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80; *La Day*, 302 F.3d at 480 (citing *Oncale*).

The plaintiff here follows none of the suggested routes for proving same-sex harassment detailed in *Oncale* and *La Day*. The plaintiff has not provided evidence that there was a general hostility toward men in the workplace. To the contrary, it appears from the record that the plaintiff worked mostly with men. The plaintiff has also not provided direct, comparative evidence about how men and women were treated differently at USG. While the plaintiff claims in his complaint that he would prove that "[o]ther similarly situated male employees of USG were <u>not</u> subjected to comments and conduct of a sexual nature alleged herein and through the remainder of his Complaint" (emphasis in original), he has produced no comparative evidence of this kind. *A fortiori,* even if he had, the U.S. Supreme Court and the Fifth Circuit have stated that the issue is whether members of one sex are treated differently than the other sex and not whether members of one sex are treated differently than others within the same sex.

The only remaining suggested path under *Oncale* and *La Day* for proving same-sex harassment is evidence of "explicit or implicit proposals of sexual activity" and "credible evidence that the harasser was homosexual." Neither the plaintiff's complaint nor his response to summary judgment alleges that the alleged harassers were actually homosexual and motivated

by sexual desire, but instead the plaintiff's pleadings rely solely on a gender stereotyping cause of action. Moore testified vaguely on the subject that he thought maybe one of his harasser's might have "messed around" with men but testified, "I can't say they were actual sexual advances, but they were gestures."

Moore's Title VII claim thus fails because he cannot prove that the harassment he suffered was because of his gender. Taking the evidence in the light most favorable to the plaintiff, the record instead demonstrates that Moore's problems at work resulted from altercations and work disputes with other employees, which Moore admitted that he, at times, provoked, and that Moore's co-employees teased, ridiculed, and harassed Moore because they perceived him to be homosexual.

The court also finds that a reasonable jury could not find that the conduct Moore complains about was objectively and subjectively "severe or pervasive," in light of the fact that Moore engages in the same type of vulgar and boorish conduct that he now complains about and because Moore admits that he socialized outside of work with two of the main alleged harassers, Williams and McKinnie, after much of the alleged harassment occurred.

B.      Prompt Remedial Action

Moore can also not prevail on his Title VII claim because he unreasonably failed to take advantage of the preventive and corrective measures afforded to him by USG.

In an alleged hostile environment case, the court must determine whether the plaintiff took advantage of preventative or corrective opportunities provided by the employer, no matter whether the alleged harasser is a supervisor or a coworker. *Woods,* 274 F.3d at 300 (coworker case); *Lauderdale,* 512 F.3d at 164-65 (supervisor case). The Fifth Circuit has "recognized that

28

an employee must take advantage of corrective opportunities provided by the employer. *Harvill,* 433 F.3d at 437 (coworker case). "[T]here is a point at which an employer will be liable for failing to end harassment notwithstanding their admonitions to the employee to report further harassment to company supervisors" when there is "an objective basis for concluding that further reports of harassment would be futile." *Woods,* 433 F.3d at 300. "Once it becomes objectively obvious that the employer has no real intention of stopping the harassment, the harassed employee is not obliged to go through the wasted motion of reporting the harassment." *Id.* at 301.

An employee "ha[s] the obligation to report the alleged harassment to the [employer] as [he has] been instructed" and a "failure to do so is fatal to [his] case." *Id.* Even where "an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a complaint" *Lauderdale*, 512 F.3d at 165. The employee is generally required to "give the company another opportunity to remedy the problem" no matter whether the alleged harasser is a coworker or a supervisor. *Woods,* 433 F.3d at 300 (coworker case); *see Lauderdale*, 512 F.3d at 165 (supervisor case); *Wyatt v. Hunt Plywood Co.,* 297 F.3d 405, 413 (5th Cir. 2002)(supervisor case); *Harvill,* 433 F.3d at 439 (coworker case); *Hockman,* 407 F.3d at 329 (coworker case). Without this showing, the employee has failed to raise a genuine fact issue that the employer failed to take prompt remedial action. *Harvill,* 433 F.3d at 439.

In *Harvill v. Westward Communications, LLC,* 433 F.3d 428 (5th Cir. 2005) and *Hockman v. Westward Communications, LLC,* 407 F.3d 317 (5th Cir. 2004), both coworker alleged sexual harassment cases, the Fifth Circuit affirmed summary judgment in favor of the

employer because it found that both employees had unreasonably failed to take advantage of corrective opportunities provided by the employer where they reported alleged sexual harassment to their supervisor, were not satisfied with the supervisor's response, but did not thereafter complain to a "higher-echelon" employee. The employer's anti-harassment policy, which both plaintiffs acknowledged they had received, stated that an employee should contact his or her supervisor in the event of harassment and if the employee did not feel that the allegation was handled satisfactorily, the employee should report the incident directly to the Director of Human Resources. The Fifth Circuit found that the plaintiffs actions in failing to report the alleged harassment to management superior to their supervisor was unreasonable since the anti-harassment policy directed them to do so, despite their supervisor's alleged statement to "never to go above her head."

In *Lauderdale v. Texas Dept. of Criminal Justice, Inst. Div.,* 512 F.3d 157 (5th Cir. 2007), the plaintiff's ultimate supervisor pursued a relationship with her. The plaintiff reported this conduct to her immediate supervisor, and the immediate supervisor's harassment continued. The plaintiff admitted that she received and read a copy of her employer's sexual harassment policy and watched a training video on the subject. The Fifth Circuit affirmed the grant of summary judgment in favor of the employer. It found that the employer had met the first prong of the *Ellerth/Faragher* defense (i.e., "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior") by virtue of its institutional policies and educational programs regarding sexual harassment. The court also found that the employer had met the second prong of the affirmative defense (i.e., "that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise"), even though she had reported the harassment to her immediate supervisor, because the employer's policy offered numerous avenues for reporting sexual harassment, and "[i]t was therefore unreasonable for Lauderdale not to pursue any other avenue available under the TDCJ policy after [her immediate supervisor] indicated his unwillingness to act on her complaint."

The Fifth Circuit directs the court to consider whether the behavior in fact ceased in determining whether an employer's actions are remedial. *Skidmore v. Precision Printing & Packaging, Inc.,* 188 F.3d 606, 616 (5th Cir. 1999). In several cases, the Fifth Circuit has found that an employer's response constitutes prompt remedial action as a matter of law where the offending behavior in fact ceased. *Skidmore,* 188 F.3d at 616; *Waymire v. Harris Co.,* 86 F.3d 424, 429 (5th Cir. 1996); *Hirras v. National Railroad Passenger Corp.,* 95 F.3d 396, 400 (5th Cir. 1996); *Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794-95 (5th Cir. 1994); *Nash,* 9 F.3d at 404; *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 309-10 (5th Cir. 1987).

In this case, the court is faced with the scenario that each time Moore reported an alleged harasser, that harasser's conduct towards Moore ceased. Moore reported Dewayne Brown for allegedly telling Moore that "all he wanted [Moore] to do was suck his dick." Moore reported Robert Hannah for allegedly calling Moore a "gay ass" after their dispute over working a spray painter. And Moore reported Fred Holmes for calling him a "gay ass motherf—ker" after their dispute over moving pallets. There is no admissible evidence in the record that these alleged harassers engaged in further offensive conduct towards Moore.

Moore also reported two other incidents, which need not be considered in the court's analysis because they, in no way, can be considered sexual harassment even under the plaintiff's

gender stereotyping theory: the event where supervisor Columbus Echols cursed Moore out about "the boards not running down the line" and the incident where supervisor Larry Dunn cursed Moore and pushed Moore after Moore accidentally released air pressure onto Dunn's leg. Nevertheless, Moore testified that these two alleged harassers also never engaged in further offensive conduct towards Moore. Moore contends that he "felt like" he was targeted unjustifiably at work after reporting these two supervisors, but even if Moore's "feeling" that he was retaliated against was enough to defeat summary judgment, retaliation because of these two sex-neutral events is irrelevant to this case.

There is no evidence in the record supporting a finding that reporting alleged sexual harassment to USG was futile because it had no real intention of stopping the harassment. Moore did not testify that he experienced retaliation because of reporting Brown, Hannah, and Holmes, and Moore could not testify that any other employees were retaliated against for reporting workplace issues:

> Q:     Have any other employees, hourly employees, told you that they feel they've been retaliated against for raising workplace issues?
> A:     It's been discussed, you know.
> Q:     Who?
> A:     I can't say who right now, because I don't remember. But, you know, you talk amongst yourselves. And that's pretty much as far as it gets.
> . . . .
> Q:     So you're not aware of any employee who had gone to the company and made a complaint of harassment, and had been retaliated against as a result of that?
> A:     No, I'm not.
> Q:     Okay. And did anyone ever tell you that they were aware of an employee who had gone to the company to complain of harassment and had been retaliated against?
> A:     No.
> . . . .
> Q:     I'm asking you, though, to give me the name of another employee who you're aware of, who has made a complaint to human resource[s] or a supervisor regarding a workplace incident and has suffered as a result.

| | |
|---|---|
| A: | I can't give you that. |
| Q: | I'm sorry? |
| A: | I can't give you that. |
| Q: | Why not? |
| A: | Because I really don't know of any. I said that this was a – |
| Q: | This kind of a scuttlebutt? |
| A: | Well, there was discussion amongst employees, where we talk about things, "Well, we don't report things, because . . ." |
| Q: | Okay. So no one's ever told you, "I went to human resources," or, "I made a complaint and I suffered as a result?" |
| A: | No, but we talk to each other on the floor, and this is a general consensus. |

The U.S. Supreme Court has referenced the avoidable consequence doctrine and the duty of a plaintiff to mitigate damages in sexual harassment cases:

> The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. An employer, may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who has taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

*Faragher*, 524 U.S. at 806-07. The Fifth Circuit has elaborated on this rational and explained that an employee can "thwart the creation of a hostile work environment" by promptly complaining about harassing conduct. *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 265 (5th Cir. 1999). An employee "should not wait as long as it usually takes for a sexually hostile working environment to develop . . . . If the plaintiff complains promptly, the then-incidental

misbehavior can be stymied before it erupts into a hostile environment, and no actionable Title VII violation will have occurred." *Id.*

In light of the foregoing, the court finds that Moore failed to take advantage of the preventive and corrective measures afforded to him by USG in some of the complained of instances, and in those instances when he did report the incidents to his employer, USG addressed his complaints with prompt remedial action.

Conclusion

For the above and foregoing reasons, the motion of the defendant USG for summary judgment is granted, and plaintiff's claims are dismissed with prejudice.

A final judgment consistent with this memorandum opinion shall issue today.

THIS the 20th day of September, 2011

/s/ Neal Biggers
NEAL B. BIGGERS, JR.
UNITED STATES DISTRICT JUDGE